**REVISED - JUNE 30, 1998**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 95-40157

_____

MELINDA PETTA, as Next Friend of Nikka Petta and Cavin Petta,
Minors; NIKKI PETTA, a Minor; CAVIN PETTA, a Minor,

Plaintiffs - Appellees,

VERSUS

ADRIAN RIVERA, Individually and in his official capacity as Texas
Department of Public Safety Highway Patrolman,

Defendant - Appellant,

and

TEXAS DEPARTMENT OF PUBLIC SAFETY,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
June 9, 1998

Before DUHÉ and DENNIS, Circuit Judges, and DUVAL, District Judge[1]:

JOHN M. DUHÉ, JR., Circuit Judge:

Officer Adrian Rivera ("Rivera") appeals the district court's

denial of his motion for summary judgment based on the defense of

_____

[1]District Judge of the Eastern District of Louisiana, sitting
by designation.

qualified immunity.  For the reasons that follow, we reverse and render.

## FACTUAL BACKGROUND

Because the parties dispute certain facts, we summarize the relevant incidents drawing inferences in the light most favorable to the nonmovants.  See Pfannstiel v. City of Marion, 918 F.2d 1178, 1183 (5th Cir. 1990).

On January 15, 1990, Rivera, a Texas Department of Public Safety ("TDPS") Patrol Officer, stopped Melinda Petta ("Petta") for speeding on Farm Road 70, southwest of Corpus Christi.  Inside the car were Petta's two children ("the Petta children"): a son, Cavin, age 3, and a daughter, Nikki, age 7.  Following a brief argument over the speed Petta had been driving, Petta alleges Rivera ordered her out of the vehicle.  When Petta refused to exit and rolled up her window, Petta alleges Rivera "lost his temper, becoming agitated, irrational, threatening and verbally and physically abusive."  Rivera then threatened to have her car towed.  When Petta still refused to exit her vehicle, she claims Rivera began screaming and cursing her, tried to jerk her door open, and attempted to smash her driver's side window with his nightstick. The alleged tirade culminated when Rivera menaced her with his .357 Magnum handgun.  Petta panicked and fled the scene.  She claims that Rivera fired a shot at her car as she drove away.

What followed was a high-speed pursuit, involving other TDPS

2

officers as well as Rivera, that covered some 19 miles through the crowded city streets of Corpus Christi. Petta claims that during the chase Rivera again shot at her vehicle, attempting to blow out her tires. The record shows that Rivera's superiors ordered him not to fire at the fleeing car and that Rivera disregarded those orders. The pursuit ended with Petta's arrest by several officers at her apartment. Petta's children were never taken into custody nor were they touched by any officers.

## PROCEDURAL HISTORY

Petta, on behalf of her two minor children, sued the TDPS and Rivera, in both his official and individual capacities, asserting various state law claims and § 1983 claims for use of excessive force in violation of the Fourth and Fourteenth Amendments. The court dismissed all state and federal claims against the TDPS and Rivera, in his official capacity, as barred by the Eleventh Amendment. As to Rivera in his individual capacity, the court granted his motion for summary judgment on plaintiffs' § 1983 claim based on the Fourth Amendment. The court, citing Brower v. Inyo County, 489 U.S. 593, 596-97 (1989), and California v. Hodari D., 499 U.S. 621, 624-26 (1991), found that no "seizure" of the children had occurred[2] that would trigger Fourth Amendment

---

[2]Plaintiffs did not appeal the district court's dismissal of their Fourth Amendment claims. Whether the district court correctly found no "seizure" of the children under these facts is therefore not before us.

3

protections.

Finding that Rivera had not moved for dismissal or summary judgment with regard to the Fourteenth Amendment claims, the court allowed Rivera an additional ten days to file an appropriate motion. Rivera accordingly filed a supplemental motion for summary judgment based on qualified immunity as to the Fourteenth Amendment claims. The court, however, denied Rivera's motion without explanation and set for jury trial plaintiffs' Fourteenth Amendment claims and supplemental state law claims of assault and battery and negligence against Rivera, in his individual capacity. The court later granted Rivera's motion to stay trial pending his interlocutory appeal.

## DISCUSSION

### I.

Generally, appellate courts have jurisdiction to hear appeals only from "final decisions" of district courts. See 28 U.S.C. § 1291 (West 1993). Certain collateral orders have been recognized as "final decisions" within the meaning of § 1291, i.e., those which "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate form the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 142-43 (1993); see Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949). A

4

district court's order denying a defendant's motion for summary judgment based on the defense of qualified immunity is an immediately appealable "final decision" under the collateral order doctrine where the order denies qualified immunity purely as a matter of law. Johnson v. Jones, 115 S.Ct. 2151, 2155 (1995); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); Boulos v. Wilson, 834 F.2d 504, 509 (5th Cir. 1987). By contrast, when a district court denies a qualified immunity defense based on its determination that the summary judgment record raises a genuine issue of fact concerning the applicability of the defense, such order is not immediately appealable under the collateral order doctrine. Johnson, 115 S.Ct. at 2156; Boulos, 834 F.2d at 509.

Here, the district court denied Rivera's motion for summary judgment based on the defense of qualified immunity without supporting explanation. We are not precluded, however, from reviewing the order. In such a case, the movant can claim on appeal "that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the Harlow standard of 'objective legal reasonableness.'" Behrens v. Pelletier, 116 S.Ct. 834, 842 (1996); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We must therefore review the record to determine what conduct the district court attributed to Rivera in finding that he had violated clearly established law and was not, therefore, entitled to the defense of qualified immunity. Behrens,

5

116 S.Ct. at 842; <u>Johnson</u>, 115 S.Ct at 2159; <u>Harlow</u>, 457 U.S. at 818.

As our discussion, <u>infra</u>, demonstrates, our review of the record shows that Rivera is entitled to the defense of qualified immunity based on the undisputed fact that the Petta children alleged purely psychological harm as a result of Rivera's actions. At the time of these events, it was not "clearly established" in our law that such non-physical harm gave rise to a constitutional tort.

## II.

A police officer who, acting under color of state law, subjects a United States citizen to a deprivation of his constitutional rights is liable for damages to the injured party. <u>See</u> 42 U.S.C. § 1983 (West 1997); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 237 (1974). The Supreme Court has read § 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them." <u>Imbler v. Pachtman</u>, 424 U.S. 409, 418 (1976); <u>see</u> <u>Tenney v. Brandhove</u>, 341 U.S. 367, 376 (1951). Thus, a police officer may interpose a defense of qualified immunity when faced with a § 1983 action. <u>Imbler</u>, 424 U.S. at 418; <u>Pierson v. Ray</u>, 386 U.S. 547, 555-557 (1967); <u>Rankin v. Klevenhagen</u>, 5 F.3d 103, 108 (5th Cir. 1993).

The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages

6

liability, provided his complained of actions meet the test of "objective legal reasonableness." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). We assess the "objective reasonableness" of an officer's actions in light of legal rules that were "clearly established" at the time those actions were taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987).

We must take care to identify the relevant "clearly established law" at the proper level of generality so that the defense of qualified immunity will serve its intended purpose, i.e., to allow officers "reasonably [to] anticipate when their conduct may give rise to liability for damages." Anderson, 483 U.S. at 639-40, quoting Davis v. Scherer, 468 U.S. 183, 195 (1984). To that end, for a right to be "clearly established" we require that its "contours ... must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. It is not necessary, however, that prior cases have held the particular action in question unlawful; "but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id., citing Mitchell, 472 U.S. at 535 n.12 and Malley v. Briggs, 475 U.S. 335, 344-45 (1986).

In Siegert v. Gilley, the Supreme Court clarified the "analytical structure" for addressing a claim of qualified immunity. 500 U.S. 226, 231-32 (1991). Once a defendant pleads a defense of qualified immunity, the trial judge must first determine

7

"whether the plaintiff has alleged a constitutional violation at all" under current law. Siegert, 500 U.S. at 232; see Rankin, 5 F.3d at 108 ("When evaluating whether a plaintiff stated a constitutional violation, we looked to currently applicable constitutional standards."). If the plaintiff has done so, the judge then determines whether the defendant's actions were "objectively reasonable" with reference to "clearly established law" at the time of the conduct in question. Siegert, 500 U.S. at 231; Rankin, 5 F.3d at 108. We have observed that this analysis will at times lead to a "somewhat schizophrenic approach," as, for example, when a court must apply conflicting legal standards to the two prongs of the test. See, e.g., Rankin, 5 F.3d at 109 & n.7.[3]

With those principles in mind, we now turn to the merits of Rivera's qualified immunity defense. We review *de novo* the denial of Rivera's motion for summary judgment on the basis of qualified immunity. Hale v. Townley, 45 F.3d 914, 917 (5th Cir. 1995); Salas v. Carpenter, 980 F.2d 299, 304 (5th Cir. 1992).

### III.

---

[3]In Rankin, we applied Hudson v. McMillian, 503 U.S. 1 (1992), to the initial "constitutional violation" question, while applying Shillingford v. Holmes, 634 F.2d 263 (5th Cir. 1981), to the "clearly established law" question, even though Hudson had altered the Shillingford test for Eighth Amendment violations. See Hudson, 503 U.S. at 9-10; Shillingford, 634 F.2d at 265. This apparent conundrum was inevitable, however, because the qualified immunity analysis requires us to evaluate the state of a "constitutional violation" at two different times, i.e., when the plaintiff files his lawsuit and when the allegedly violative conduct occurred. See Siegert, 500 U.S. at 231-32.

A.

The Petta children claim that Rivera's abusive behavior and use of excessive force during the initial stop and ensuing chase caused them severe emotional harm and thus deprived them of liberty without due process, in violation of the Fourteenth Amendment. See, e.g., Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir. 1990); Pleasant v. Zamieski, 895 F.2d 272, 276 n.2 (6th Cir. 1990); Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1408 n.10 (9th Cir. 1989).[4] We assume without deciding that the Petta children have alleged a constitutional violation under current law[5] because we find that, at the time of the incident in question, the law was not "clearly established" that a police officer's use of excessive force resulting in purely emotional harm rose to the level of a constitutional due process violation.

B.

---

[4]We cite cases from other Circuits because, as our discussion, infra Part III.B.4 demonstrates, we have not found cases in our Circuit, post-Graham v. Connor, 490 U.S. 386 (1989), analyzing excessive force claims under the Fourteenth Amendment where, although in the context of an arrest or investigatory stop, no technical "seizure" had occurred for Fourth Amendment purposes. Cf. Ikerd v. Blair, 101 F.3d 430, 433 n.6 (5th Cir. 1996); Mouille v. City of Live Oak, 918 F.2d 548, 550-51 (5th Cir. 1990).

[5]But see Ikerd, 101 F.3d at 434 n.10 (declining to address issue, in Fourth Amendment context, whether some *physical* injury is required to state excessive force claim), and Hinojosa v. City of Terrell, Texas, 834 F.2d 1223, 1230 (5th Cir. 1988)(declining to reach issue, outside Fourth Amendment context, "whether or not some type of physical injury will in *every* instance be necessary for [§] 1983 liability in a use of excessive force claim.). See discussion infra Part III.B.3.

In order to assess what "clearly established" legal standards governed Rivera's actions on January 15, 1990, we must trace the origins in this Circuit of a Fourteenth Amendment claim based on a police officer's use of excessive force.

1.

In Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir. 1981), we first sketched the parameters of such a claim, relying in part on Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980), and Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973). We defined the "constitutional tort" thus:

> If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983.

Shillingford, 634 F.2d at 265. Regarding the "severe injury" requirement, we specifically noted that "[t]he degree of force exerted and the extent of physical injury inflicted that together amount to a constitutional deprivation must, of course, be determined by the facts of a given case." Id. We thus avoided drawing any "bright lines" based on the severity of a particular injury that would separate constitutional from non-constitutional violations. Id., citing Baker v. McCollan, 443 U.S. 137 (1979). Furthermore, in addressing the factual situation presented in

10

Shillingford,[6] we focused as much on the *potential* for severe injury created by the policeman's conduct as on the actual injury itself. Shillingford, 634 F.2d at 266 ("That the results of the attack on Shillingford's person were not crippling was merely fortuitous. That same blow might have caused blindness or other permanent injury.").

Shillingford provided the standard for excessive force claims in this Circuit for the next eight years.[7] We note, however, a

---

[6]Shillingford involved a policeman's unprovoked attack of a bystander who was attempting to photograph an arrest. The policeman smashed Shillingford's camera into his face with a nightstick, destroying the camera and lacerating Shillingford's forehead. Shillingford, 634 F.2d at 264.

[7]See, e.g., Raley v. Fraser, 747 F.2d 287, 289 (5th Cir. 1984); Lynch v. Cannatella, 810 F.2d 1363, 1375 (5th Cir. 1987); Stevens v. Corbell, 832 F.2d 884, 889 (5th Cir. 1987); Hinojosa v. City of Terrell, Texas, 834 F.2d 1223, 1229 (5th Cir. 1988); Brumfield v. Jones, 849 F.2d 152, 156 (5th Cir. 1988). In 1986, however, the Supreme Court decided Whitley v. Albers, 475 U.S. 312 (1986), which may have imposed a slightly different standard on excessive force claims based on the Eighth Amendment's prohibition of cruel and unusual punishments. In Whitley, the Court stated that "whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purposes of causing harm.'" Whitley, 475 U.S. at 320-21, quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973). We observe, however, that in formulating its standard for Eighth Amendment excessive force violations in 1986, the Supreme Court relied on Johnson v. Glick, supra, the same case the Shillingford court had relied on. See Shillingford, 634 F.2d at 265. Also, we have before held that the Whitley test did not govern a *Fourteenth* Amendment excessive force claim in 1987, see Stevens, 832 F.2d at 889, while at the same time noting the Supreme Court's statement in Whitley that "at least in the prison security guard context, the 'Due Process clause affords no greater protection than does the Cruel and Unusual Punishment Clause.'" Id., quoting Whitley, 475 U.S. at 327. Thus, it seems unclear

11

handful of decisions applying Shillingford that shed light on the question before us.

In McFadden v. Lucas, 713 F.2d 143 (5th Cir. 1983), we considered a prisoner's § 1983 claim, alleging, *inter alia*, that twenty-two correction officers forced him, through an "intimidating show of force," to shave his beard, which he wore for religious reasons, in violation of the First and Eighth Amendments. In determining whether the plaintiff had stated a claim that his right to be free from cruel and unusual punishment had been violated, we relied on Shillingford and Johnson v. Glick, supra. Id. at 146. We found that plaintiff's complaint

> [fell] so short of stating a section 1983 cause of action as to warrant *sua sponte* dismissal by the court below. The plaintiff has nowhere alleged that he was physically assaulted. In fact, the plaintiff nowhere alleges that, except for the commonplace event of being shaved, any touching of his person occurred at all.

Id. at 146-47. We went on to state that, even if the officers' show of force could be considered excessive, "we must, *in the absence of physical abuse*, concur with the lower court's dismissal." Id. at 147 (emphasis added). The absence of physical abuse seemed to us, under those circumstances, to prevent the

---

whether there was a different standard for Eighth Amendment, as opposed to Fourth and Fourteenth Amendment, excessive force claims in 1986; as our discussion, infra, demonstrates, however, the need to distinguish became clearer with the Supreme Court's decisions in Graham v. Connor, 490 U.S. 386 (1989), and Hudson v. McMillian, 503 U.S. 1 (1992).

12

alleged misconduct from "shock[ing] the conscience."  Id., quoting Rochin v. California, 342 U.S. 165, 172 (1952).

In Coon v. Ledbetter, 780 F.2d 1158 (5th Cir. 1986), we allowed a § 1983 claim for excessive force on behalf of a young child under circumstances somewhat similar to ours.  In Coon, the police allegedly fired into a trailer attempting to apprehend the trailer's owner, Billy Dan Coon.  Coon's four-year-old daughter, Racheal, was inside the trailer when the shot was fired.  Although the facts do not indicate that Racheal suffered anything but "sleeplessness and nightmares" after the incident, we nonetheless found that she had sufficiently alleged a violation of her constitutional rights.  Id. at 1160-1161.[8]

In Coon, we addressed the contours of the excessive force claim in the context of whether the plaintiffs had adequately alleged a constitutional violation.  Id. at 1160-61.  We discussed the officers' defense of qualified immunity only insofar as it could arise on retrial.  Id. at 1164.  We did not, in any case,

_____

[8]Addressing why Racheal had alleged sufficient "personal loss required for a constitutional claim," and why her mother, Dana, had not, we stated:

> There was no evidence that any act of the deputies was directed toward Dana; she was not directly involved in the shooting and was with the deputies when it occurred. Racheal, however, was in the trailer. There was evidence that Coon staggered into the trailer and while he was there attempted to protect Racheal from the gunfire, and there was evidence that Deputy Gussberry fired a round of heavy buckshot into the trailer at that time.

Id. at 1161.

13

squarely address the question whether non-physical injury alone could satisfy the Shillingford test (although we certainly implied that it would). Regarding the applicability of qualified immunity, we merely observed that "[u]se of excessive force in making an arrest violates clearly established rights, and the doctrine of qualified immunity therefore does not shield an officer who uses excessive force." Id.

We do not call Coon into question, however. In 1986, Shillingford was "clearly established law" in this area and we had not yet drawn any "bright lines" between constitutional and non-constitutional violations on the basis of physical or non-physical injuries (see discussion infra at III.B.3). Thus, the Coon court's implicit finding that the officers' conduct there satisfied the Shillingford test (and in particular that Racheal Coon's injuries were "severe," see Shillingford, 634 F.2d at 265) appears justified in light of "clearly established" legal rules at that time.

Shortly after Coon, we decided Checki v. Webb, 785 F.2d 534 (5th Cir. 1986), in which police officers allegedly chased the plaintiffs at high speeds without probable cause and then physically abused them at a police roadblock. Id. at 535-36. In finding that the plaintiffs had filed suit in a proper venue under 28 U.S.C. § 1391 and had thus interrupted prescription under Louisiana law, we considered where the plaintiffs' constitutional claim "arose" for purposes of the federal venue statute. Id. at

14

537-38. We held that, although the plaintiffs sustained all *physical* injuries in the Middle District of Louisiana, they could have properly alleged a constitutional violation arising out of the officers' conduct (the high-speed chase) in the Eastern District:

> It cannot be reasonably argued that no serious physical danger confronts civilians who are forced to travel at speeds over 100 mph in their attempt to flee a terrorizing police officer. Furthermore, there is no valid reason for insisting on physical injury before a section 1983 claim can be stated in this context. A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him.

Id. at 538. Thus, we found venue proper in the Eastern District of Louisiana. Id.

Over a year later we decided Jefferson v. Ysleta Independent School District, 817 F.2d 303 (5th Cir. 1987). In Jefferson, the parents of an eight-year-old girl sued school officials under § 1983 for allegedly tying her to a chair with a jump rope for the greater part of two days, denying her access to the bathroom and thereby causing her "humiliation and mental anguish ... and [impairment] in her ability to study productively." Id. at 304. We affirmed the district court's rejection, on summary judgment, of the defendants' claim of qualified immunity:

> We are persuaded that in January 1985, a competent teacher knew or should have known that to tie a second-grade student to a chair for an entire school day and for a substantial portion of a second day, as an educational

15

exercise, with no suggested justification, such as punishment or discipline, was constitutionally impermissible.

Id. at 305. We found, citing Shillingford, that plaintiffs' allegations, if proven, "would implicate, *inter alia*, Jardine's fifth and fourteenth amendment rights to substantive due process, specifically her right to be free from bodily restraint." Id.[9] Again, we did not squarely address whether non-physical injuries (which are all that were *alleged* in Jefferson, although the claimed constitutional wrongs clearly involved prolonged physical distress) would satisfy the Shillingford "severe injury" requirement. Instead, we focused on the outrageous conduct of the defendants. See id.

Less than a year later, we addressed in Hinojosa v. City of Terrell, Texas, 834 F.2d 1223 (5th Cir. 1988), the hypothetical situation posited in Checki (supra, 785 F.2d at 538), but perhaps reached a different result than the Checki panel had predicted. There, the plaintiff sued several officers under § 1983 for allegedly using excessive force against him where, in the course of

---

[9]As our discussion of legal developments subsequent to Jefferson demonstrates (see discussion infra III.B.3), we need not distinguish Jefferson. We do point out, however, that the constitutional right relied upon in Jefferson, while deriving from the due process clause, was slightly distinct from that relied on by the Petta children. Arguably, a due process right "to be free from bodily restraint," see Jefferson, 817 F.2d at 305, is conceptually different from a due process right "to be free from excessive force," where the claimed excessive force does not involve any bodily restraint or "damage to a person's bodily integrity," see Shillingford, 634 F.2d at 265, whatsoever.

16

an altercation and subsequent arrest, an officer waved a gun in the plaintiff's face. We treated the plaintiff's claims as arising under the Fourteenth Amendment, however, because we found that the alleged excessive force (waving a gun in the plaintiff's face) occurred before, and was not involved in, the plaintiff's subsequent arrest. See id. at 1229 n.7. We found that the plaintiff had not produced sufficient evidence under Shillingford to support the jury's finding in his favor on the excessive force claim. We therefore reversed the district court's denial of the defendant's motions for judgment notwithstanding the verdict and for new trial. Id. at 1229-31.

We found in Hinojosa that the plaintiff's injury "which [could] only be characterized as temporary emotional distress, simply [did] not rise to a level that can be redressed for such a claim under section 1983." Id. at 1229. We then stated that

> [t]here is absolutely no evidence ... that Hinojosa was struck, *or even touched*, during the incident. Hinojosa did not claim to have suffered *even minor physical injuries* or intrusion.

Id. (emphasis added). While those statements strongly suggest that the Hinojosa panel would have required some *physical* injury to meet the Shillingford "severe injury" requirement, the panel went on to state that "[t]his Court does not here determine whether or not some type of physical injury will in *every* instance be necessary for section 1983 liability in a use of excessive force claim."

17

Id.[10]

2.

In sum, <u>Shillingford</u> was the "clearly established law" governing most, if not all, excessive force claims from January 15, 1981 until July 5, 1989, when we decided <u>Johnson v. Morel</u>, 876 F.2d 477 (5th Cir. 1989)(<u>see</u> <u>infra</u> Part III.B.3). We pause here, however, to assess the state of the law just prior to <u>Johnson</u> to demonstrate that Officer Rivera might *not* be entitled to qualified immunity if <u>Shillingford</u> and its progeny had continued to be "clearly established law" for the Petta children's claims.

As the law stood under <u>Shillingford</u>, <u>McFadden</u>, <u>Coon</u>, <u>Checki</u>, <u>Jefferson</u> and <u>Hinojosa</u> (<u>see</u> <u>supra</u>), our Circuit seemed to make an analytical distinction between (1) cases deciding whether a defendant was entitled to qualified immunity on a claim of excessive force (<u>see, e.g.</u>, <u>Jefferson</u>, 817 F.2d at 305; <u>Lynch v. Cannatella</u>, 810 F.2d 1363, 1374 (5th Cir. 1987)) and (2) cases determining whether a plaintiff had sufficiently alleged a cause of action for excessive force under § 1983 (<u>see, e.g.</u>, <u>Shillingford</u>, 634 F.2d at 265; <u>Hinojosa</u>, 834 F.2d at 1229-30).[11] Such a

---

[10]The <u>Hinojosa</u> panel seemed to cite with approval the Seventh Circuit's decision in <u>Gumz v. Morissette</u>, 772 F.2d 1395 (7th Cir. 1985), which stated that "the ultimate question here is, after all, whether the use of force was so egregious as to be constitutionally excessive, and the presence of some physical injury is certainly relevant to that determination." <u>Id</u>. at 1401.

[11]<u>Coon</u>, we should note, is somewhat of an anomaly since it addressed both questions, <u>see</u> <u>Coon</u>, 780 F.2d at 1160-61, 1164, but

18

distinction is justified in the following sense: in the former cases, we focused on the "objective reasonableness" of the defendant's actions in order to further one purpose of the qualified immunity defense, i.e., "to insure that [public officials] do not hesitate to take actions reasonably calculated to advance the public good," Lynch, 810 F.2d at 1374; in the latter cases, we focused, *inter alia*, on the severity of the alleged injury, because the purpose of such threshold requirements in a § 1983 excessive force claim is "to distinguish potential constitutional violations from mere breaches of state tort law." Hinojosa, 834 F.2d at 1229; Shillingford, 634 F.2d at 264. It would then follow that the "severity" of a particular injury would be determinative only in the second group of cases: i.e., where we are assessing whether a plaintiff has adequately pled a constitutional violation. See, e.g., Hinojosa, 834 F.2d at 1230; Gumz, 772 F.2d at 1401.

If such were the analysis in the Fifth Circuit today, the Petta children could plausibly argue that Rivera is *not* entitled to assert the defense of qualified immunity: Rivera's conduct violated "clearly established law" (i.e., Shillingford) because it would have been apparent to a reasonable officer that such conduct (a high-speed chase, shooting at the fleeing car's tires) in response to a speeding violation (1) was grossly disproportionate

considered the severity of the plaintiff's injury under neither.

19

to the need presented, (2) was motivated by malice,[12] and (3) *could have* caused severe injuries.[13]  See, e.g., Hinojosa, 834 F.2d at 1229.  That is the position of the dissent (see infra at ___), as we understand it.  Our precedents intervening between 1988 and January 15, 1990 (the time of the conduct in question here), however, slightly alter the focus of our qualified immunity analysis (see discussion infra Part III.B.3) and constrain us to part company with the dissent.

3.

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court held that

> *all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

Graham, 490 U.S. at 395.  The Court thus rejected the Johnson v. Glick test (see discussion supra Part III.B.1) for those excessive force claims that implicate the Fourth Amendment's "explicit

---

[12]In any event, plaintiffs could have argued that the summary judgment record presented genuine factual disputes as to the first two elements and that the district court's denial of Rivera's qualified immunity defense was therefore unreviewable on appeal under the collateral order doctrine.  See discussion supra Part I; see also Johnson v. Jones, 115 S.Ct. at 2156.

[13]Under the Shillingford analysis, whether Rivera's conduct *in actual fact* caused "severe injuries" would only be an appropriate inquiry in addressing whether the Petta children adequately alleged a constitutional violation.  See Shillingford, 634 F.2d at 266.

20

textual source of constitutional protection against this sort of physically intrusive governmental conduct...." Id.[14] The Court endorsed the Johnson v. Glick test, however, in the context of an *Eighth* Amendment excessive force claim. Id. at 398 n.11 (Johnson v. Glick test "might be useful in analyzing excessive force claims brought under the Eighth Amendment."). Finally, the Court recognized that the due process clause could have continuing viability in excessive force claims not implicating a specific Bill of Rights protection. Graham, 490 U.S. at 395 n.10 (because it is unclear whether the Fourth Amendment extends to pretrial detainees, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.").

Expressly relying on Graham, our *en banc* Court addressed, in Johnson v. Morel, 876 F.2d 477 (5th Cir. 1989), whether the plaintiff had stated a Fourth Amendment violation where an officer roughly handcuffed him during an investigatory stop, allegedly resulting in permanent scars on his wrists. Johnson, 876 F.2d at

---

[14]The Fourth Amendment standard, as explicated by the Court, assesses the "objective reasonableness" of an officer's conduct by focusing on

> the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. at 396, citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).

21

478-79.  We stated that "[t]here can be a constitutional violation only if significant injuries resulted from the officer's use of *excessive* force."  Id. at 479-80.[15]  Notably, we appended the following footnote to our "significant injury" holding:

> We think it unlikely that such a significant injury will be caused by unnecessary force without significant *physical* injury. However, on the facts before us here, we do not decide whether a significant but non-physical injury would be legally sufficient.

Id. at 480 n.1.  Finding that the plaintiff had created a fact issue as to whether his injuries were "significant," we allowed him to go forward with his excessive force claim.  Id. at 480.

Judge Rubin, joined by six other Judges, concurred in the Court's judgment, but criticized the majority, *inter alia*, for adding a "significant injury" requirement to the Fourth Amendment claim.  Johnson, 876 F.2d at 480-81 (Rubin, J., concurring).[16]

---

[15]We set forth the required elements for an excessive force claim based on a violation of the Fourth Amendment as:

(1) a significant injury, which
(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was
(3) objectively unreasonable.

Johnson, 876 F.2d at 480.  At the same time, we "overrule[d] all previous decisions of the circuit to the contrary."  Id.

[16]Significantly for our purposes, Judge Rubin remarked that "[e]ven under the stringent Fourteenth Amendment 'shock the conscience' test, a plaintiff could recover for a policeman's use of excessive force without demonstrating that he had suffered severe, permanent, or *physical* injuries." Johnson, 876 F.2d at 481 (Rubin, J., concurring)(emphasis added).  Judge Rubin cited Checki

22

Additionally, Judge Rubin dissented from the majority opinion insofar as it read Graham to bar the plaintiff's due process claims for abuse that occurred *before* and *after* the arrest. Id. at 482-84; see Graham, 490 U.S. at 394-95 & n.10.

Johnson v. Morel remained the law in this Circuit until Hudson v. McMillian, 503 U.S. 1, 7-8 (1992), although itself in the Eighth Amendment context, overruled by implication Johnson's "significant injury" requirement.[17] See, e.g., Harper v. Harris County, Texas, 21 F.3d 597, 600 (5th Cir. 1994)("We now hold that the Johnson standard is no longer valid in the wake of Hudson v. McMillian ....").  Between July 5, 1989 and February 25, 1992, however, Johnson v. Morel was "clearly established law" regarding an excessive force claim brought under the Fourth Amendment.  As we have noted above, this is the relevant "legal window" within which we must look to determine whether Officer Rivera's actions on January 15, 1990 were "objectively reasonable."

The most significant development in our Circuit's law regarding excessive force claims and qualified immunity came,

_____

v. Webb (see supra Part III.B.1) for the proposition that non-physical injuries were cognizable under the due process clause. Id. at 481 n.9.

[17]Reversing the Fifth Circuit, the Supreme Court in Hudson held that a prisoner was not required to prove "significant injury" as a prerequisite to his Eighth Amendment excessive force claim; instead, the Court adopted the Whitley v. Albers (see supra note 7) "malicious and sadistic" standard for all Eighth Amendment excessive force claims.  Hudson, 503 U.S. at 6-7.

ironically,[18] almost three years after the <u>Johnson v. Morel</u> window closed, in <u>Dunn v. Denk</u>, 54 F.3d 248 (5th Cir. 1995), <u>rev'd en banc</u>, 79 F.3d 401 (5th Cir. 1996).  In <u>Dunn</u>, a police officer arrested the plaintiff in January, 1990, and in doing so allegedly threw her facedown in a ditch, put his knee in the small of her back, handcuffed her, pulled her up by her arms and placed her in his squad car.  <u>Dunn</u>, 54 F.3d at 249.  The plaintiff, who was on a weekend pass from a mental institution and was being driven home by her friend when they were stopped, alleged she suffered only minor bruises but serious psychological injury.  <u>Id</u>.  She sued the officer under § 1983 for malicious prosecution and use of excessive force;  the jury found for her on the latter claim.  <u>Id</u>.

The <u>Dunn</u> panel found that the officer was not entitled to qualified immunity, because "[i]t was clearly established before January 1990, when Denk arrested Dunn, that both physical and psychological injuries were compensable in civil rights actions." <u>Id</u>. at 250, <u>citing</u> <u>Hinshaw v. Doffer</u>, 785 F.2d 1260 (5th Cir. 1986) and <u>Keyes v. Lauga</u>, 635 F.2d 330 (5th Cir. 1981).  The <u>Dunn</u> majority thus included "significant injury" as a component of the restrospective, "clearly established law" prong of the qualified

---

[18]Ironic, because normally we would look only to case law in effect on January 15, 1990, to determine what law was "clearly established" at that time.  The two decisions in <u>Dunn v. Denk</u> are relevant, however, because they provide a retrospective assessment of what "clearly established law" was regarding a Fourth Amendment excessive force claim in January, 1990.  <u>See</u> <u>Dunn</u>, 79 F.3d at 402; 54 F.3d at 250.

24

immunity analysis:

> Although no longer required, *at the time of this incident* significant injury was a necessary element of an excessive force claim. Accordingly, to defeat Denk's qualified immunity defense Dunn was obliged to prove a significant injury.

Dunn, 54 F.3d at 249 (emphasis added); see Siegert, 500 U.S. at 231; Rankin, 5 F.3d at 108-09 & n.7; see also discussion supra Part III.B.1.  Although he dissented, Judge Barksdale, like the majority, viewed the "significant injury" requirement as an element of the "clearly established law" guiding the officer's conduct at the time of the incident.[19]  He simply disagreed with the majority that, under Johnson in 1990, it was "clearly established" that the plaintiff had a constitutional right to be free from non-physical, psychological injury resulting from excessive force.  See Dunn, 54 F.3d at 256 (Barksdale, J., dissenting).

A fragmented *en banc* Court vacated the Dunn panel opinion and found the officer entitled to qualified immunity.  See Dunn v. Denk, 79 F.3d 401, 403 (5th Cir.)(en banc), cert. denied 117 S.Ct 61 (1996).  Eleven judges joined Part I of Judge King's "majority"

---

[19]Judge Barksdale initially observed:  "It goes without saying that, to avoid a qualified immunity defense, a plaintiff must claim a constitutional violation that was clearly established at the time of the alleged wrongful conduct."  Dunn, 54 F.3d at 253 (Barksdale, J., dissenting).  He later stated that "even assuming *arguendo* that nonphysical injury can be 'significant' under Johnson, the question remains whether this rule was 'clearly established' at the time of the incident in issue, so as to place Officer Denk outside the protection of qualified immunity."  Id. at 255.

25

opinion, six of those judges by way of separate concurrence.[20]
While conceding that under Hudson v. McMillian, supra, the
plaintiff's injury may well have satisfied *present* constitutional
standards, see 79 F.3d at 402-03, Judge King continued her analysis
by "look[ing] to the state of the law when the arrest at issue
occurred."  Id. at 403, citing Harper, 21 F.3d at 601.[21]  Judge
King went on to state:

> Given the explicit language of Johnson, and
> its footnote 1 in particular, we conclude that
> the law at the time of this arrest was
> uncertain regarding whether "a significant
> injury will be caused by unnecessary force
> without significant physical injury."  On the
> present facts, Denk was entitled to qualified
> immunity from the claims asserted in this

---

[20]Judge King's opinion was joined by Judges Garwood,
Higginbotham, Davis and Duhé.  Judge Barksdale concurred separately
in Part I of Judge King's opinion, but dissented to Part II;  he
was joined by Judges Jolly, Jones, Smith, Garza and DeMoss.  Judge
Reavley, joined by Chief Judge Politz and Judges Wiener, Benavides,
Stewart, Parker and Dennis, dissented.  Judge Dennis also wrote a
separate dissent.  When we have sifted through the wreckage, it is
clear that Part I of the Dunn *en banc* decision commanded a majority
of the Court (eleven judges).

[21]Thus, it seems clear that Judge King's analysis was directed
towards the *second* prong of the qualified immunity analysis, i.e.,
whether the officer's actions were "objectively reasonable" under
"clearly established law" at the time of the incident in question.
As support for that conclusion, we note that Judge King cited to
the part of Harper v. Harris County, Texas that emphasized "the
objective reasonableness of a government official's conduct must be
measured *with reference to the law as it existed at the time of the
conduct in question*."  Harper, 21 F.3d at 601 (emphasis added).
Later on that same page, the Harper panel chided the district court
for "not consider[ing] the seriousness of the alleged injuries in
determining whether the officer's conduct was objectively
reasonable."  Id.  Such a qualified immunity analysis mirrors that
employed by both the panel and *en banc* decisions in Dunn.

26

case.

Dunn, 79 F.3d at 403, quoting Johnson, 876 F.2d at 480 n.1.[22]

This holding demonstrates the same qualified immunity analysis as that employed by the Dunn panel majority and dissent, supra. Judge King relied on the significance of the injury as, using the defendant's phrase, an "objective, validating event of the reasonableness of force used in making an arrest." Dunn, 79 F.3d at 403. The dissent to the *en banc* decision confirms this view. In arguing that the majority "distort[ed] the law of qualified immunity," the dissent advocated a focus, not on the *results* of the officer's actions (i.e., whether they caused "significant injury") but rather on the reasonableness of the *actions* themselves:

> Qualified immunity is concerned only with the reasonableness of an officer's actions. Once an officer uses objectively unreasonable force to effect an arrest, he loses his qualified immunity, whether the other elements of an excessive force claim are clearly established or not.

Dunn, 79 F.3d at 405, 407 (Reavley, J., dissenting). The dissent, therefore, did not consider the severity of injury a component of the "clearly established law" determining the "objective reasonableness" of an officer's actions. The dissent defined "clearly established law" at a higher level of generality than the

---

[22]We note that as of this date, this Court has never *squarely held* that non-physical injury is sufficient to establish a violation of the Fourth Amendment. A recent panel declined to reach that very issue. See Ikerd v. Blair, 101 F.3d 430, 434 & n.10 (5th Cir. 1996).

27

majority, i.e., the law clearly proscribes the use of objectively unreasonable and excessive force by an arresting officer. Id. at 405. Judge King criticized the dissent's position as having "no support in the case law." Id. at 403 n.1.

Thus, emerging from the *en banc* decision in Dunn is a qualified immunity analysis that, at least for Fourth Amendment excessive force claims, differs slightly from the analysis employed in cases such as Coon, Jefferson and Lynch. See discussion supra Part III.B.1. The principal difference, as we appreciate it, is that Dunn relies on the severity of injury not only in defining a constitutional tort under *present* law, but also as an "objective, validating" factor in assessing the "objective reasonableness" of an officer's conduct.[23] Irrespective, however, of the difference between Dunn's analysis and the qualified immunity cases going before it, Dunn currently governs in this Circuit a qualified

---

[23]Compare Dunn, 79 F.3d at 403 (relying on severity of injury as "objective, validating event" in assessing objective reasonableness of officer's actions), with Jefferson, 817 F.2d at 305 (assessing school officials' defense of qualified immunity without considering severity of plaintiff's injury ); Lynch, 810 F.2d at 1375-76 (relying on severity of injury as one of three factors in determining whether officers' conduct assumed constitutional dimensions); Coon, 780 F.2d at 1163 ("[u]se of excessive force in making an arrest violates clearly established rights, and the doctrine of qualified immunity therefore does not shield an officer who uses excessive force"; addressing qualified immunity defense without considering severity of plaintiff's injuries). See also Anderson, 483 U.S. at 639-40 (intended purpose of qualified immunity defense is to allow officers "reasonably [to] anticipate when *their conduct* may give rise to liability for damages.")(emphasis added).

28

immunity analysis in the context of a Fourth Amendment excessive force claim.[24]

4.

Dunn does not end our inquiry, however. Dunn addressed a claim for excessive force grounded in the *Fourth* Amendment. See Dunn, 79 F.3d at 402; 54 F.2d at 249. As we observed, supra, the district court in this case dismissed the Petta children's Fourth Amendment claims on finding that they had not been "seized." See supra note 2 and accompanying text. Their remaining claims, then, are grounded in the due process clause of the Fourteenth Amendment. See Graham, 490 U.S. at 395 n.1.[25] The question remains, then,

---

[24]We appreciate that Dunn focuses on a narrow legal window (June 5, 1989 to February 25, 1992) and will have increasingly limited applicability over the passage of time. This is doubly true insofar as Hudson v. McMillian may have foreclosed using the severity of injury as a determinative factor in delineating constitutional violations. See, e.g., Dunn, 79 F.3d at 402-03 ("Counsel for Denk correctly concedes that whatever injury requirement (if any) may remain after Hudson respecting a claim for excessive force in arrest is satisfied here.").

[25]In view of the foregoing statement, we find it difficult to understand the dissent's assertion that

> the majority fails to acknowledge clearly that an officer's excessive, unreasonable and outrageous use of deadly force against helpless and innocent bystanders such as the Petta children violates their Fourteenth Amendment substantive due process rights; and that, otherwise, innocent bystanders would be shorn of all constitutional rights and have less protection under the constitution and § 1983 tha[n] prisoners, arrestees, and detainees.

See infra at ___. On the contrary, we explicitly acknowledge that where a plaintiff's excessive force claim, whether he be a

29

whether <u>Dunn</u> also affects a Fourteenth Amendment excessive force claim arising during an *attempted* but ultimately unsuccessful[26] arrest.  Under the specific facts of this case, we must answer in the affirmative; therefore, we find that in January, 1990, the Petta children did not have a "clearly established" due process right to be free from excessive force resulting in purely psychological harm.

Our inquiry here is very narrow.  We are *not* asking whether the Petta children's psychological injuries *were* redressable under the Fourteenth Amendment in January, 1990.  We are merely asking whether a § 1983 plaintiff at that time had a *clearly established* right under the Fourteenth Amendment to be free from purely emotional harm resulting from an officer's use of excessive force.  We have already demonstrated (<u>see</u> discussion <u>supra</u> Part III.B.3)

prisoner, arrestee, detainee, or an innocent bystander of tender years, falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the due process clause of the Fourteenth Amendment.  <u>See</u> <u>Graham</u>, 490 U.S. at 395 n.1.  The Petta children have done so, and nothing we say here detracts one iota from their constitutional right to do so.  The dissent's broad assertions, however, beg the question whether the Petta children's due process claims fall within the parameters of our caselaw defining the scope of their constitutional rights.

[26]"Unsuccessful" in the sense that the *excessive force* (i.e., shooting at the tires and driving at high speeds) did not result in the arrest.  Petta's arrest occurred subsequent to the chase and apparently did not involve excessive force.  <u>See</u> <u>Hinojosa</u>, 834 F.2d at 1229 n.7 ("While Hinojosa was arrested, there was no evidence that Jones' pointing of his gun was done to effectuate Hinojosa's arrest.").  In any case, Petta does not anywhere allege that excessive force was used against her or her children when she finally surrendered at her apartment.

30

that such a right was *not* clearly established in January, 1990, under the *Fourth* Amendment. What we hold here is simply that the same right was equally "unclear" (for qualified immunity purposes) under the *Fourteenth* Amendment. We do so for essentially two reasons: (1) our cases following Graham v. Connor do not clearly distinguish between Fourth and Fourteenth Amendment analyses in this context; we are thus persuaded that Johnson v. Morel and Dunn v. Denk (see discussion supra Part III.B.3), although admittedly addressing the Fourth Amendment right, also affected[27] the Fourteenth Amendment right to be free from excessive force; and, (2) *under the particular facts here*, we see no principled reason for drawing an analytical distinction between the Petta children's due process claim and an arrestee's Fourth Amendment claim, given the substantially similar concerns implicated by the two claims (e.g., the right to be free from excessive force in an arrest situation and the need for a police officer to use reasonable force in effecting arrests).

Prior to Graham, no consistent attempt was made to cabin excessive force claims under the Fourth, Eighth or Fourteenth Amendments. Thus, the Shillingford standard was applied to excessive force cases regardless of which constitutional amendment

---

[27]"Affected," in the sense that Johnson (as interpreted by Dunn) interjected into *both* the Fourteenth and Fourth Amendment excessive force claims "uncertainty" about whether purely non-physical injury rose to the level of a constitutional violation. See infra; see also Dunn, 79 F.3d at 403.

31

was implicated. See, e.g., Brumfield v. Jones, 849 F.2d 152, 156 (5th Cir. 1988)(Fourth Amendment); Lynch, 810 F.2d at 1375 (due process clause); Jamieson v. Shaw, 772 F.2d 1205, 1210 (5th Cir. 1985)(Fourth Amendment). See also Stevens v. Corbell, 832 F.2d 884, 889 (5th Cir. 1987) (noting similarity of Shillingford standard to Whitley Eighth Amendment standard). Following the Supreme Court's guidance in Graham, see 490 U.S. at 393-95, one would have expected three distinct lines of excessive force jurisprudence, i.e., under the Fourth, Eighth and Fourteenth Amendments. To a certain extent, our post-Graham cases have distinguished among the respective constitutional amendments in analyzing excessive force claims. See, e.g., Colston v. Barnhart, No. 96-40634, 1997 WL 741806, at *3 (5th Cir. Nov. 19, 1997); Spann v. Rainey, 987 F.2d 1110, 1115-16 & n.8 (5th Cir. 1993); King v. Chide, 974 F.2d 653, 656-57 (5th Cir. 1992). We can discern, however, no clear "line" of *Fourteenth* Amendment excessive force cases following Graham that would clearly establish a different set of standards for such claims.

In fact, our review of Fifth Circuit case law following Graham demonstrates a tendency to "blur" the lines between Fourteenth Amendment and either Fourth or Eighth Amendment excessive force standards, depending upon the particular factual context. For example, we held in Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993), that a pretrial detainee's excessive force claim,

32

although technically grounded in the Fourteenth Amendment, was properly analyzed under Eighth Amendment standards. In assessing "what standard of due process" to apply to the plaintiff's claim that a jail official had subjected him to excessive force in quelling a disturbance, we stated:

> [W]e are guided by the standard announced in Whitley and Hudson. While these cases specifically addressed claims of excessive use of force brought by convicted prisoners, it is impractical to draw a line between convicted prisoners [subject to the Eighth Amendment] and pretrial detainees [subject to the Fourteenth Amendment] for the purpose of maintaining jail security.

Id. at 1445-46 (brackets added). We noted that the Eighth Amendment standards were useful in this particular Fourteenth Amendment context because of the similar concerns implicated "whenever guards use force to keep order." Id. at 1446, quoting Hudson, 503 U.S. at 6. See also Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993); Bender v. Brumley, 1 F.3d 271, 277-78 (5th Cir. 1993); Nerren v. Livingston Police Department, 86 F.3d 469, 472-73 (5th Cir. 1996)(cases following Valencia and applying Eighth Amendment standards to excessive force claims of arrestees and pretrial detainees).

Similarly, we have applied Fourth Amendment standards to excessive force claims that may have in part implicated the due process clause. For example, in Mouille v. City of Live Oak, 918 F.2d 548 (5th Cir. 1990), we addressed the excessive force claims

33

of several plaintiffs whom a police officer had allegedly terrorized when he burst into an office building in search of a suspect. Id. at 550. Only one of the plaintiffs was arrested; the others were mere bystanders subjected to the officer's violent behavior. Id. We addressed all of the excessive force claims under the Fourth Amendment, observing that

> [t]he Supreme Court has stated that 'all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment....'

Id., quoting Graham, 490 U.S. at 395. We did not consider whether all of the plaintiffs were "seized" within the meaning of the Fourth Amendment. It is at least arguable, however, that some of the plaintiffs in Mouille were not "seized" and that, therefore, their claims would have been more properly analyzed under the due process clause. See Brower v. Inyo County, 489 U.S. 593, 596-97 (1989)[28]; Graham, 490 U.S at 395 n.10. See also Ikerd, 101 F.3d at 433 n.6 (applying Fourth Amendment standards to excessive force

---

[28]For example, plaintiff Laurie Rollins was allegedly pushed by the police officer into a wall as he searched for the suspect Mouille. Mouille, 918 F.2d at 550. Plaintiff Grace Rollins was not touched or otherwise targeted by the officer at all; she only claimed that the officer had "terrified" her by abusing her daughter. Id. at 554. Arguably, both plaintiffs' claims did not implicate the Fourth Amendment because they were not "seized" by the officer, i.e., the officer did not detain either plaintiff "through means intentionally applied." See Brower, 489 U.S. at 596-97. The officer apparently did not intend to arrest or question either plaintiff.

34

claim where police officer grabbed child's arm; child's father, and not the child herself, was the object of the arrest); <u>Stroik v. Ponseti</u>, 35 F.3d 155, 156-57 (5th Cir. 1994)(applying Fourth Amendment to excessive force claim where hostage was shot by police officer as officer fired at her captor).

It is not our intention, however, to find fault with cases like <u>Mouille</u>, <u>Ikerd</u> and <u>Stroik</u>. We simply observe that, just as we have sometimes used the Eighth Amendment to guide our due process standards in certain excessive force cases, we have likewise used Fourth Amendment standards in cases that, at least in part, implicated substantive due process. Such a practice seems to us driven partly by precedent and partly by policy concerns.

As we have already discussed (<u>see</u> <u>supra</u> Part III.B.1), the excessive force claim originated in the undifferentiated context of the due process clause, "quite apart from any 'specific' of the Bill of Rights." <u>Johnson v. Glick</u>, 481 F.2d 1028, 1032 (2nd Cir. 1973). We had no reason to differentiate among the amendments until <u>Graham</u>[29] in 1989; thus, it comes as little surprise that the

---

[29]A literal application of <u>Graham</u> to all claims of excessive force used "*in the course of* an arrest, investigatory stop or other 'seizure,'" 490 U.S. at 395 (emphasis added), could result in application of the Fourth Amendment to situations partially covered by the due process clause. For example, in <u>Hinojosa</u>, (<u>supra</u> Part III.B.3) the police officer allegedly used excessive force (waving a gun in the plaintiff's face) "in the course of" an arrest; we applied due process standards because the excessive force used was separate from, and did not result in, the plaintiff's arrest. <u>See</u> <u>Hinojosa</u>, 834 F.2d at 1229 n.7. A strict adherence to <u>Graham</u>'s language, however, would mandate application of the *Fourth*

35

standards continue to "overlap" somewhat.  See, e.g., Nerren, 86 F.3d at 473 n.20 (noting "overlap" of arrestee's Fourth Amendment rights with his due process rights); Valencia, 981 F.2d at 1449 n.44 (noting "continued convergence of the various tests under the Fourth, Eighth and Fourteenth Amendments for maltreatment of arrestees, detainees or convicted prisoners, respectively."). Such an "overlap" is borne out, in our view, by cases such as Harper, where we held that Hudson v. McMillian's removal of the "significant injury" requirement from the Eighth Amendment standard also affected the Johnson v. Morel Fourth Amendment standard.  See Harper, 21 F.3d at 600;  see also Oliver v. Collins, 914 F.2d 56, 59 n.1 (5th Cir. 1990)(pre-Hudson, looking to Johnson v. Morel and its Fourth Amendment standard "in determining whether a particular injury is of sufficient magnitude to invoke Eighth Amendment protection....").

Underlying policy concerns may also explain the apparent "overlap."  In cases such as Valencia and its progeny, supra, we

_____

Amendment in Hinojosa.  Indeed, it would seem that our decisions in Mouille, Stroik and Ikerd, supra, adopt that approach.  While we agree that the quoted language from Graham, supra, does support such a broad application of the Fourth Amendment, we merely observe here that footnote 10 in Graham could arguably be read to limit application of Fourth Amendment standards to those situations in which an officer has "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen." Graham, 490 U.S. at 395 n.10, citing Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) and Brower, 489 U.S. at 596.  We submit that footnote 10 represents a *narrower* view of the applicability of the Fourth Amendment than the language quoted in Mouille, supra.  See also Rankin, 5 F.3d at 107 n.3.

36

borrowed Eighth Amendment standards in treating excessive force claims under the due process clause.  We did so because the concerns vindicated by a convicted prisoner's excessive force claim under the Eighth Amendment and those vindicated by a pretrial detainee's excessive force claim under the due process clause are largely the same:  the need to guide the proper application of force in maintaining jail security.  See Valencia, 981 F.2d at 1446.  We therefore adjudged it "impractical" to adopt different criteria for pretrial detainees, even though their claims are brought under the Fourteenth Amendment.  Id.

The same reasoning applies to the Petta children's claims.  We find it impractical and illogical to draw a line between their due process claims and those of an arrestee who claims, under the Fourth Amendment, that a police officer has used excessive force in effecting his arrest.  Whether Officer Rivera's use of force was "objectively reasonable" largely implicates Fourth Amendment concerns,[30] even though the fortuity of his bullet going astray removed this case from the purview of "seizure" cases.  See Brower, 489 U.S. at 596-97.

This could well mean that the *present* constitutional standards

---

[30]For example, were we to weigh the reasonableness of Rivera's shooting at Petta's car and engaging her in a high speed chase, we would be interested, *inter alia*, in the severity of Petta's crime, in whether her flight "pose[d] an immediate threat to the safety of the officers or others," and whether Petta was "actively resisting arrest or attempting to evade arrest by flight."  See Graham, 490 U.S. at 396, citing Tennessee v. Garner, 471 U.S. at 8-9.

for the Petta children's claims are governed by the Fourth Amendment "reasonableness" standard of <u>Tennessee v. Garner</u> (<u>see</u> <u>supra</u> notes 14 & 29).  But, as we have observed above (<u>supra</u> Part III.A.1), we need not decide that question today.  We simply observe that our precedents, such as <u>Johnson v. Morel</u>, <u>supra</u>, and <u>Dunn v. Denk</u>, <u>supra</u>, interjected as much uncertainty into our *Fourteenth* Amendment jurisprudence as into our Fourth Amendment jurisprudence, regarding whether a purely non-physical injury rose to the level of a constitutional violation.[31]

---

[31]We do not quarrel with the dissent's assertion that the Petta children need not "point to a precisely and explicitly analogous case that existed prior to an officer's violation of the plaintiff's constitutional rights" in order to defeat Officer Rivera's claim of qualified immunity.  <u>See</u> <u>infra</u> at ___; <u>see</u> <u>also</u> discussion <u>supra</u> Part II, <u>citing</u> <u>Anderson</u>, 483 U.S. at 640.  Again, however, that statement merely begs the question whether Officer Rivera's actions violated constitutional rights "clearly established" at the time of those actions.  The dissent fails to consider that our precedent was not only unclear about the parameters of a Fourteenth Amendment excessive force claim, but that it also failed to clearly distinguish between Fourth and Fourteenth Amendment standards for such claims.  <u>See</u> discussion <u>supra</u> Parts III.B.3 & III.B.4.

More importantly, however, the dissent disregards the effect on the plaintiffs' due process rights of our *en banc* decisions in <u>Johnson v. Morel</u>, <u>supra</u>, and <u>Dunn v. Denk</u>, <u>supra</u>, merely finding the reasoning in those cases "inapposite" because they were decided under the Fourth Amendment.  <u>See</u> <u>infra</u> at ___.  Our discussion in Part III.B.4 demonstrates that the excessive force claim did not originate, nor does it presently exist, in neat, hermetically-sealed categories according to which constitutional amendment the claim implicates.  Instead, cases arising under one amendment have consistently affected the parameters of rights that, while arising under different constitutional amendments, implicate similar policy concerns.  <u>See</u> Part III.B.4; <u>see</u> <u>also</u> <u>Harper</u>, 21 F.3d at 600; <u>Valencia</u>, 981 F.2d at 1445-46.  The dissent does not consider that phenomenon and thus fails to appreciate both the practical and theoretical underpinnings of our excessive force jurisprudence.

38

We have observed before that the qualified immunity analysis partakes of a somewhat "schizophrenic" nature. See Rankin, 5 F.3d at 109. This case aptly demonstrates that phenomenon. In assessing Officer Rivera's defense of qualified immunity, we must assess the law as it stood some eight years ago, even when our case law may have now moved on. We must therefore hold that in January, 1990, the Petta children had no "clearly established" constitutional right under the due process clause to be free from a police officer's use of excessive force where the only injuries allegedly suffered were psychological. We therefore find that the district court erred in denying Officer Rivera's motion for summary judgment based on the defense of qualified immunity.

IV.

For the foregoing reasons, we REVERSE the judgment of the district court and RENDER judgment, granting Officer Rivera's motion for summary judgment based on the defense of qualified immunity.

REVERSED AND RENDERED