**Paul STRICKLAND and Brooke Blue, Individually and as Natural Parents and Next Friends of Brittany Strickland, Paul Strickland, Jr. and Beyonce Strickland, Minors, Plaintiffs**

v.

**CITY OF CRENSHAW, MISSISSIPPI, et al., Defendants.**

**No. 3:14CV107–M–A.**

United States District Court, N.D. Mississippi, Oxford Division.

Signed July 20, 2015.

---

3. *See* 31 U.S.C. § 3716.

6. *See* 28 U.S.C. § 2412(d)(2)(A).

Steven Todd Jeffreys, Povall & Jeffreys, PA, Cleveland, MS, for Plaintiffs.

Gary E. Friedman, Gregory Todd Butler, William T. Siler, Jr., Jason Thomas Marsh, Phelps Dunbar LLP, Jackson, MS, Daniel J. Griffith, Michael S. Carr, Griffith & Griffith, Cleveland, MS, R. Jeff Allen, Hunt Ross & Allen, Clarksdale, MS, for Defendants.

### ORDER

MICHAEL P. MILLS, District Judge.

This cause comes before the court on the motion of defendants for summary judgment, pursuant to Fed.R.Civ.P. 56. Plaintiffs have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that defendants' motion should be granted as to plaintiffs' federal claims and that this court should decline to exercise supplemental jurisdiction over their state law claims.

This is, *inter alia*, a wrongful search and excessive force case arising out of the October 10, 2013 search of a residence located at 111 Terry Road in Crenshaw, Mississippi. Plaintiff Paul Strickland lives at the location, along with plaintiff Brooke Blue and their three minor children, who are likewise plaintiffs. The structure where plaintiffs live is divided into five (5) adjoining apartments, and plaintiffs live in apartment three. Defendant Jason Sims was working as a Crenshaw police officer on October 9, 2013, and he testified in his deposition that, some time before midnight, something "caught [his] attention" to watch the 111 Terry location. Sims testified that he knew Strickland resided at the location, but he was unaware of the exact layout of the structure there.

Sims testified that he had heard reports from members of the community about drugs being sold at Strickland's residence, though he could not recall specifically who had told him that. Defendant Shawn Shelton, also a Crenshaw police officer, similarly testified that he had conversations with other officers, including Sims, about reports that "Strickland may have been selling narcotics out of his residence." James Willard, who was the Crenshaw Chief of Police at the time, likewise testified that he had heard that Strickland "had been selling narcotics out of his residence." In their brief, defendants provide an unflattering picture of Paul Strickland, writing that:

Neither Strickland nor Blue are employed, and they do not pay any rent to [the owner of the residence]. Strickland

has a Porsche, two Lexuses, and a Cadillac as his vehicles. Strickland is no stranger to law enforcement. He previously served 18 months in prison for burglarizing a home and a school, and he has been jailed "[p]lenty of times" over the years for failing to pay child support for one of his children who does not live with him.

[Defendants' brief at 2–3].

Sims testified that he noticed an individual exiting a vehicle near Strickland's residence, although he could not discern exactly where that individual went. In their brief, plaintiffs write that:

Sims stated he could see that more than one (1) person was in the vehicle as he could see into the side of the vehicle when one (1) person stepped out. Sims acknowledged that there were other buildings in the area, although he did not know the other individuals who lived in the vicinity. When the person got out of the car, Sims saw him walk in the "general vicinity" of 111 Terry Avenue and then the person was out of view. Sims did not see the person go to a door at the structure as he could not see a door from his vantage point. Sims was not using binoculars to watch the individual. He acknowledged there were other residences within the square block he was observing. The individual came back into Sims' view and returned to his vehicle after about two (2) minutes.

[Plaintiffs' brief at 2–3].

After the vehicle pulled away from the 111 Terry location, Sims stopped it after he noticed it lacked a license plate. Lekedrick Tribble, a minor, was driving the vehicle. According to Sims, Tribble, whom Sims had never seen before, immediately stated that he had just purchased marijuana at "Paul's" residence. Tribble stepped out of the vehicle, and Sims testified that he saw what appeared to be marijuana on the floorboard of the vehicle. After questioning Tribble and a female passenger in the vehicle, Chelitta Black, Sims arrested Tribble and took him to the Crenshaw police station. At the station, Sims interviewed Tribble, with his mother present for at least part of the interview. Afterwards, Sims prepared a statement which both Tribble and his mother signed. That statement reads as follows:

After being advised of my *Miranda* rights I voluntarily give the following statement. This statement is being given in the presence of my mother Louise Tribble.

On tonight I went to a guy named Paul's house in Crenshaw. I drove to his house and parked next door and Paul came to the door and I asked him if he had some weed and he said "yeah what's up." I told him "let me get one," gave him a $5 bill, and he walked back into the house and came back with a $5 bag of marijuana. I walked back to the van I was driving and drove away. The police stopped me and told me that the van did not have a tag on it and asked why I was at Paul's house. I told the officer that I had just bought a bag of weed. The officer told me to get out of the van and then the officer saw the bag of marijuana on the floor of the van. He placed me in handcuffs and told me to sit in his police car. He took me to the police station and called my mother. My mother came to the Crenshaw police department and the officer told my mother what happened. He read me my rights in the presence of my mother, and I agreed to give a voluntary statement. I was not threatened or coerced into giving a statement to the officer. I along with my mother have both read this statement and it is accurate. I have had the opportunity to make any corrections.

Based largely upon this statement, Sims prepared an application for a warrant to search plaintiffs' home. Sims testified that Chief Willard helped him put together the Underlying Facts and Circumstances affidavit in support of the application, and Willard and Officer Shelton co-signed it. Local judge Mike Wilson authorized the warrant early on the morning of October 10.

The Crenshaw police department enlisted the help of officers from both the Panola County and Quitman County Sheriffs' Departments in conducting the search, and both of those counties and several of their officers are defendants in this lawsuit.[1] The parties' accounts of what happened during that search differ greatly. Plaintiffs' account of the search is as follows:

Crenshaw police officers, Quitman County police officers and Panola County police officers thereafter conducted a search of Strickland and Blue's residence between 6:00 and 7:00 a.m. on October 10, 2013. Strickland testified that after several officers stormed into his room and woke him up that morning, he was pulled onto the floor. He was placed in handcuffs and Officer Sims and Chief Willard pointed their guns on him for 3–4 minutes.

Blue testified she was awakened to Officer Shelton having a gun in her face. She said Deputy Linzy (Quitman County) had a gun pointed at her in the doorway of her room while Officer Shelton was handcuffing her. She stated guns were pointed at her for about a minute. Blue testified that during the search, Dewayne Linzy of Quitman County pointed a gun directly at her oldest daughter (Beyonce) and the other children who were in front of the oldest daughter as they were walking out of

the house. Strickland testified that during the search, a couch, cabinet doors, a front door, a wrought iron door and french doors were damaged. Blue confirmed the damage. Plaintiffs' sworn discovery responses list property damage of $5,314.88. Strickland testified his children were traumatized by the police. The minor girls' grades have been negatively impacted. He could not afford desired counseling for the children. Blue said her oldest daughter, Beyonce, was negatively affected by having a gun in her face.

Thus, plaintiffs assert that Quitman County Deputy Dewayne Linzy "pointed a gun directly at" their children, but Linzy denied having done so, and all officers testified that they witnessed no such thing occur.

The municipal defendants describe the search as follows:

Various law enforcement officers assisted in executing the warrant at Strickland's residence. In addition to Crenshaw Officers Sims, Willard, and Shelton, law enforcement officers from the [Panola County Sheriff's Department and Quitman County Sheriff's Department] were present during the search. Officer Sims was the lead officer entering the residence. Upon making entry, the officers witnessed children in the front of the apartment. The children were ushered outside, and the officers proceeded to the back of the apartment. Strickland and Blue were detained in the back of the apartment and taken outside with the children. An extensive search was conducted, but nothing other than an empty cigar wrapper containing what appeared to be a green leafy substance

---

1. However, plaintiffs have conceded their claims against the municipal defendants (including the City of Crenshaw and both coun-

ties), and the sole contested claims in this case relate to those against individual officers.

was found. It is undisputed that none of the plaintiffs were physically injured by any of the law enforcement officers. It also is undisputed that none of the plaintiffs were arrested following the search.

The parties thus agree that no drugs were found at plaintiffs' residence and that no arrests were made. Following the fruitless search, plaintiffs filed the instant action in state court, and it was timely removed to this court. Defendants have presently moved for summary judgment, arguing that no genuine issue of fact exists regarding their liability and that they are entitled to judgment as a matter of law.

### *Unlawful search*

The court first considers plaintiffs' unlawful search claims, arising out of their argument that the warrant which authorized the search of their home was legally defective. In discussing this claim, the court will concentrate its discussion primarily upon plaintiffs' claims against Officer Sims, who signed the affidavit in support of the warrant and is clearly regarded by plaintiffs as being the "worst actor" in this regard. While plaintiffs do make rather conclusory allegations that other Crenshaw officers should be liable for having "signed off" on the warrant application, it is clear to this court that, if plaintiffs are unable to establish a violation by Sims in this regard, then they would likewise be unable to do so against the other officers.

■ It is important to emphasize that, in order to prevail in their unlawful search claims against Sims, plaintiffs must satisfy the requirements of two separate legal doctrines: the underlying Fourth Amendment standard and the qualified immunity standard. Plaintiffs' burden of proof regarding each is made more difficult by the fact that, as they concede, Sims sought and obtained a search warrant from a neutral magistrate, rather than simply "going it alone." Indeed, the Fifth Circuit has not-

ed the general rule that "[i]f the facts supporting an arrest are put before an intermediary such as a magistrate or grand jury, the intermediary's decision to issue a warrant or return an indictment breaks the causal chain and insulates the initiating party." *See Smith v. Gonzales,* 670 F.2d 522, 526 (5th Cir.1982).

In seeking to establish a Fourth Amendment violation on the part of Sims, plaintiffs rely upon an exception to this general rule, which is applicable when an affidavit supporting a warrant is tainted by a "materially false statement or omission." *See Moreno v. Dretke,* 450 F.3d 158, 169 (5th Cir.2006), citing *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Fifth Circuit has held that this so-called "*Franks* exception" requires that plaintiffs demonstrate that a defendant (1) knowingly or recklessly omitted exculpatory information from the affidavit he submitted in support of the warrant application and (2) that "the warrant would [not have] establish[ed] probable cause" if the omitted information had been included in the affidavits. *Johnson v. Norcross,* 565 Fed.Appx. 287, 289 (5th Cir. 2014), *citing Freeman v. Cnty. of Bexar,* 210 F.3d 550, 553 (5th Cir.2000). The court concludes that plaintiffs' proof is insufficient to establish fact issues regarding either part of this test in this case.

■ The court will first discuss the second part of the *Franks* test, known as the "materiality" test, since the content of Sims' affidavit is relevant to a discussion of all issues relating to his liability. Once again, the materiality inquiry in the *Franks* test requires a showing by plaintiffs that "the warrant would [not have] establish[ed] probable cause" if the omitted information had been included in the affidavits. *Johnson,* 565 Fed.Appx. at 289. In this vein, it should be noted that a showing of probable cause to support a

search warrant is not a highly stringent one, merely requiring evidence which, considering the totality of the circumstances, reveals "a fair probability that [ ] contraband or evidence of a crime will be found in a particular place." *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Importantly, probable cause may rest upon evidence (including hearsay evidence) which is not legally competent in a criminal trial, *Draper v. United States,* 358 U.S. 307, 311, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and it need not be sufficient to prove guilt in a criminal trial. *Brinegar v. United States,* 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Based upon this standard, this court views the information which was included in Sims' affidavit as being more than sufficient to establish probable cause to search Strickland's home, even if plaintiffs' objections to certain omissions are assumed to be valid ones. In the court's view, the greatest factual support for a finding of probable cause comes from the statement signed by Tribble and his mother, which has previously been quoted. In his affidavit in support of an application for a search warrant, Sims relied heavily upon Tribble's statement, writing that:

### DETAILS

On Wednesday, October 9th, 2013, I observed an individual park a vehicle next to 111 Terry Avenue where there have [sic.] reports of narcotics trafficking. I observed the individual exit his vehicle and walk to 111 Terry Avenue while a female front seat passenger remained inside the vehicle. Approximately 2 minutes later I observed the same individual walk from 111 Terry Avenue and return to his vehicle. The individual got into the driver's seat and drove away. The vehicle did not have a tag displayed and I initiated a traffic stop at the intersection of Missouri Avenue and Broad Street. Upon speaking with the individual, who I later arrested, I was advised by the individual that he had just purchased a bag of marijuana from an individual at the house who is named Paul. I located and secured a plastic bag containing a green leafy substance which looked and smelled like marijuana in the driver's floor which the individual stated that he had purchased from Paul. The individual, after being properly Mirandized, provided a voluntary statement which was consistent with his earlier statement.

Based upon the foregoing information, I have probable cause to believe that evidence of a Controlled Substance along with contraband used to weigh, package, deliver and sell along with currency derived from the illegal sale of the Controlled Substance may be concealed at 111 Terry Avenue, Town of Crenshaw, Panola County, Mississippi.

*/s/ Officer Jason M. Sims, Sr.*

■ In their briefing, plaintiffs have failed to cast doubt upon the accuracy of the information stated above, and, in the court's view, it strongly supports a conclusion that probable cause existed to search Strickland's home. That is, the statement correctly asserts that a suspect whom Sims had observed conducting a brief visit to the 111 Terry location, and in whose vehicle he had found illegal drugs immediately thereafter, stated that he had obtained those drugs from "Paul." While plaintiffs emphasize that the 111 Terry location contains (unbeknownst to Sims at the time) multiple residences, they have not suggested that there was any other individual named "Paul" living at any of them.

In arguing that Sims violated the Fourth Amendment, plaintiffs' focus is not on any misstatements in his affidavit, but upon

information which he did not include in it. Specifically, plaintiffs argue that:

> In the present case, the primary focus should be on what information Officer Sims did not provide to the judge issuing the Search Warrant. Sims did not clearly set forth that he did not see Lekedrick Tribble enter the residence at 111 Terry Avenue. He did not gather any information or provide same in the warrant documents to provide information to bolster the reliability that Lekedrick Tribble actually went to 111 Terry Avenue. There was no description of the inside of the premises or who was there or whether Tribble had ever been there before. Likewise, Sims had never met Tribble before, and had never used him as an informant (and didn't relate that information). Sims acknowledged that he even had questions about Tribble's credibility. None of this was contained in the warrant documentation.
>
> Additionally, Sims did not disclose that Lekedrick Tribble was a minor. He did not disclose that Lekedrick Tribble could not write well. He did not disclose that he himself actually wrote the "Voluntary Statement" signed by Tribble. He did not disclose that he had threatened the occupant of the car, Chelitta Black, with arrest, towing of vehicle and having her baby seized by DHS, within earshot of his informant, Lekedrick Tribble.
>
> Sims did not disclose that Chelitta Black actually disputed the facts as set forth in "Voluntary Statement" by Tribble, and that he (Sims) chose not to have Black give a statement. He also failed to disclose that he did not determine whether Lekedrick Tribble's mother could read or write. The statement also was not "sworn".

The court finds plaintiffs' arguments to be insufficient to establish fact issues regarding the materiality of any of these omissions, based upon the *Franks* standard.

Plaintiffs contend that Sims should have made it more clear that he did not directly observe Tribble entering Strickland's apartment, but the court views the importance of this omission as being greatly reduced by the fact that Tribble specifically stated that he bought the drugs at "Paul's" apartment. Once again, there is no contention that there was a "Paul" living at any other apartment at 111 Terry, and Tribble's testimony that he bought drugs from an individual with that name removes the materiality of the issue of whether or not Sims actually saw Tribble walk into a specific apartment.

Plaintiffs argue that Sims should have included facts which might have impeached Tribble's credibility, including that he was a minor who had not previously served as an informant and that he had limited ability to write. In the court's view, none of these facts, if included, would have cast sufficient doubt upon the reliability of Tribble's statement to negate a clear finding of probable cause to search Strickland's residence. In so concluding, the court notes that Sims had at his disposal, and stated in his affidavit, objective evidence confirming Tribble's account, including the facts that he personally observed him approaching the 111 Terry location for a short visit and that he subsequently found marijuana in his vehicle. Moreover, it strikes this court that a witness does not require a great deal of age, writing ability, or prior experience as an informant to convey the basic fact that he had, mere minutes previously, purchased marijuana from a particular individual.

The court similarly finds unpersuasive plaintiffs' argument that Sims made a material omission in failing to include allegedly exculpatory statements by Chelitta Black, the passenger in the vehicle. In establishing Black's statements in this regard, plaintiffs rely upon a dash cam video

depicting the arrest and a subsequent conversation between Sims and Black. Plaintiffs provide a lengthy description of and excerpt from the transcript of that conversation in their brief, which this court will quote directly:

Lekedrick Tribble, a minor, was driving the vehicle. According to Officer Sims, Lekedrick Tribble, who Sims had never seen or even met before, immediately stated that he had just purchased marijuana. Id. at pgs. 26–27. Tribble stepped out of the vehicle, and Sims testified that he saw what appeared to be marijuana on floorboard of the vehicle. Id. at p. 26. See also Ex. D. A review of the dash cam video reveals the following. The vehicle stopped was a black Nissan Quest mini van/SUV. See Ex. D at:28. Sims immediately handcuffed Lekedrick Tribble as he was exiting the vehicle. Id. at 1:59. Sims does appear to pick up an object from the floor of the vehicle and indiscernible talking can be heard. Id. at 2:18. A passenger in the vehicle, an African American female, comes out of the vehicle with her hands up. Id. at 3:08. Sims brings the minor Tribble back to his vehicle and asks "you got anymore on you?", and appears to place an object on the hood of his vehicle. Id. at 3:19. Sims has the female occupant empty her pockets. Id. at 4:00. She then comes and stands in front of the police car. Id. at 4:45. And then later, she retrieves a child from the vehicle. Id. at 6:00. Sims then begins to search the Quest vehicle. Id. at 7:00. Sims comes back to the police vehicle and asks the female if she moved the object, but he later finds it on the hood of his vehicle where he previously placed it. Id. at 9:00. A sheriff's deputy vehicle drives up to the scene and drives off. Id. at 13:02. Then, Sims begins to ask Chelitta Black, the female occupant, questions. Id. at 13:40. The following was thereafter stated by Officer Sims, Chelitta Black and Lekedrick Tribble:

Officer Sims: What year is that truck?

Chelitta Black: 2000

Officer Sims: What color is that, black?

Chelitta Black: Yes, sir.

Officer Sims: So he told you, you say he told you he was gonna get a bag, right?

Chelitta Black: Uh huh.

Officer Sims: So he didn't go get no lot of dope,

Chelitta Black: Oh no, sir.

Officer Sims: He just went to get a bag,

Chelitta Black: Yes, sir.

Officer Sims: And where'd he tell you he was getting that bag from?

Chelitta Black: Oh, he didn't.

Officer Sims: He didn't ....where'd he get the bag from?

Chelitta Black: I don't know where he got the bag from.

Officer Sims: You don't know where he got that bag of weed from?

Chelitta Black: No, sir.

Officer Sims: What'd he just do over here at Paul's house?

Chelitta Black: I didn't ever get out.

Officer Sims: I mean so ya'll riding around looking for weed and you don't know where ... did he stop anywhere else and get some weed?

Chelitta Black: No, sir.

Officer Sims: Ok so he didn't have weed before he went over there did he?

Chelitta Black: That's ...

Officer Sims: Cause he told you he was going to get some right?

Chelitta Black: I don't know.

Officer Sims: Did he tell you ... I tell you what I'm fixing to do—you can sit here and play crazy with me ...

Chelitta Black: Naw, I'm....(inaudible)

Officer Sims: And I'm fixing to tow your truck, I'm gonna arrest you, I'm gonna tow your truck and I'm gonna call DHS to come pick your baby up so let's not play no games we grown folk. Alright? You ain't sitting and not knowing what's going on—you in the truck you know what's going on. He already told me that he bought it over at Paul's house. He already told me that. Look at him shaking his head yeah. He already told me he got it over at Paul's house.

Lekedrick Tribble: I ain't tell you why I was going over there, though.

Officer Sims: Ok. But you ... but he did tell you he was going to get a bag of weed?

Chelitta Black: Uh huh.

Officer Sims: And that was before ya'll went to Paul's, right?

Chelitta Black: Uh huh.

Officer Sims: Ok and he didn't have weed before he went to Paul's did he?

Chelitta Black: See that's what im saying. I don't know that part there now is what I'm telling you.

[plaintiffs' brief at 3–6].

In the court's view, the dash cam video evidence is, on balance, favorable to Sims, and it certainly does not provide a basis for concluding that he committed a Fourth Amendment violation in failing to include Black's statements in his affidavit. Indeed, the court views plaintiffs' own description of the videotape as supporting a conclusion that a reasonable officer in Sims' position would have felt he was "on the right track" in believing that Strickland had sold Tribble the marijuana which

he discovered. That is, plaintiffs' transcript quotes Sims as saying that Tribble had confessed to buying the drugs from "Paul," and there is no indication that either Tribble or Black spoke up at any time to deny this assertion. It is sometimes the case that video recordings of arrests will cast doubt upon an officer's version of events, but the court does not regard that as being the case here.

In their brief, plaintiffs seize upon the fact that Black stated that she did not know how or where Tribble obtained the bag of marijuana found in his car, but the court regards this as being a very selective description of her statements. Black quoted Tribble as saying that the stated purpose of his trip was to buy marijuana, and she answered "no sir" when asked whether they had stopped anywhere else to buy drugs. Moreover, Sims made repeated reference to Tribble and Black having stopped at "Paul's" house, and Black never denied that this was where they had stopped. Perhaps most importantly, it should be clear that a witness stating that she was unaware of a particular fact does not constitute exculpatory information; it merely means that a witness has disclaimed knowledge of a particular matter. Accordingly, Black's statement that she didn't know where Tribble got the marijuana is not exculpatory of Strickland.

Plaintiffs also argue that Sims acted improperly in threatening Black that he would "tow [her] truck," arrest her, and "call DHS to come pick [her] baby," in an apparent effort to make her more forthcoming regarding her knowledge of the alleged drug transaction. Plaintiffs may well be correct that Sims should not have employed this form of coercion, but this ultimately has little relevance to the claims in this case.[2] Black is not a plaintiff in this

---

2. The court notes that an argument could be made that Sims' threats to call DHS were appropriate, given that there were facts before him indicating that Tribble had taken her

lawsuit, and Sims' threats have little relevance to the issue of whether his failure to include her statements in his affidavit was a material omission. In the court's view, the apparent coercion used by Sims would have been relevant in this case if, in response to his threat, Black had made new inculpatory statements and if Sims had chosen to use those statements in his affidavit. Neither of these are the case.

■ Black's statements after Sims' threat were consistent with those she had made before it, and, at any rate, Sims did not use her statement in his affidavit. Moreover, the court views plaintiffs as having very little reason to complain of Black's statements having been left out of Sims' affidavit, since they were, on balance, somewhat inculpatory of Strickland. Plaintiffs note that Sims' threats to Black were within "earshot" of Tribble, apparently suggesting that they may have influenced his subsequent statement, but the court regards this as being highly speculative, at best. Indeed, Sims notes in the video that Tribble had already confessed to buying drugs from "Paul" at the time the threat to Black was made, thus removing any argument for the materiality of the threat as to Tribble's statement. In light of the foregoing, the court concludes that any omissions in Sims' affidavit were not material, since probable cause to search Strickland's residence would have existed even if all of the matters raised by plaintiffs had been included in the affidavit. As such, the second part of the *Franks* test is not met, and plaintiffs are unable to demonstrate an underlying Fourth Amendment violation by Sims.

While it is unnecessary to so conclude, the court notes that plaintiffs are also unable to establish fact issues regarding the first part of the *Franks* test, which inquires whether Sims acted knowingly or

recklessly in omitting the information in question from his affidavit. Once again, plaintiffs are unable to establish that any of the information which Sims *did* include in his affidavit was false, and, given the court's conclusion that any omissions from the affidavit were not material, it would certainly be difficult to conclude that he acted knowingly or recklessly in omitting them. It may well be that Sims' statement in support of his affidavit was rather "bare-bones," but it was sufficient for its purpose, namely providing accurate and material facts in support of a finding of probable cause.

Thus, this court is unable to conclude that Sims acted even negligently in preparing the affidavit, and it certainly has no basis to conclude that he knowingly or recklessly made material omissions in doing so. This conclusion is supported by the fact that Sims enlisted the help of his fellow officers in preparing it, a fact which is consistent with an officer proceeding in a careful manner. The manner in which Sims obtained Tribble's statement further supports this conclusion. As noted previously, Sims took care to question Tribble (at least partially) with his mother present, and he had her co-sign a statement which noted the fact that her son had been Mirandized prior to giving the statement and had an opportunity to review and correct it. These strike this court as being the actions of a non-reckless police officer.

In light of the foregoing, the court concludes that plaintiffs are unable to establish either of the two parts of the *Franks* test with regard to Sims and that he therefore committed no Fourth Amendment violation in obtaining a search warrant in this case. This conclusion likewise applies to the other individual Crenshaw defendants who signed off on the warrant, as to whom

baby to a drug transaction, with the potential dangers that such entails.

plaintiffs provide very few substantive arguments.

The court now turns to the issue of qualified immunity, which constitutes an additional burden for plaintiffs to surmount, in the event that this court has incorrectly determined that no Fourth Amendment violation was committed by Sims. Moreover, the qualified immunity issue is relevant to all plaintiffs' claims against all remaining defendants in this case, and the court will accordingly discuss it in some detail.

The Fifth Circuit has described the basic qualified immunity standard as follows: "This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."

*Johnson,* 565 Fed.Appx. at 290, *citing Freeman v. Gore,* 483 F.3d 404, 410–11 (5th Cir.2007).

It should be apparent that, in this case, the first part of the qualified immunity analysis, i.e., whether any defendant violated the plaintiffs' constitutional rights in preparing the search warrant, has already been answered in the negative by this court. The second part of the qualified immunity analysis, i.e., whether the "defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question" involves a very different inquiry from the first, and it imposes very substantial additional burdens on plaintiffs.

■ Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiffs have the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith,* 117 F.3d 866, 871–72 (5th Cir.1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity). Part of plaintiffs' burden in this regard is to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question, and the U.S. Supreme Court has made it clear just how heavy a burden this may be.

■ In *Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014), the Supreme Court recently emphasized that:

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.* at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts … not to define clearly established law at a high level of generality," *id.* at 2074, since doing so avoids the crucial question whether the official acted reason-

ably in the particular circumstances that he or she faced.

*Plumhoff*, 134 S.Ct. at 2023. Thus, the Supreme Court has stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority on point which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.*

The difficult nature of plaintiffs' qualified immunity burden was clearly demonstrated in the 1987 decision of *Anderson v. Creighton*, 483 U.S. 635, 637, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Anderson*, the Supreme Court considered a qualified immunity defense raised in a case where an FBI agent performed a warrantless search of a house based upon an incorrect suspicion that a bank robber was hiding there. Significantly, the majority in *Anderson* did not appear to disagree that the law was clearly established at the time that the Fourth Amendment prohibited warrantless searches of homes, absent probable cause and exigent circumstances. Nevertheless, the Supreme Court emphasized that:

It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed

Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

*Anderson*, 483 U.S. at 641, 107 S.Ct. 3034.

■ The Supreme Court in *Anderson* thus made it clear that, in the qualified immunity context, the "objective unreasonableness" inquiry is not merely a legalistic discussion of precedent, but also a determination of what a reasonable officer *could have believed* regarding the legality of his actions, given the specific circumstances of a case. This is a crucial point, since what lawyers and judges may conclude regarding the state of the law involves a very different inquiry than determining what a reasonable officer faced with a "real world" situation could have believed regarding the legality of his actions. In this vein, the Supreme Court has repeatedly emphasized that "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, ── U.S. ──, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015), *citing Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011). Clearly, this is an exceedingly difficult burden, as it was intended to be.

■ It should thus be clear that, in seeking to recover monetary damages against Sims and the other Crenshaw defendants based on the obtaining of the search warrant, plaintiffs face a much more difficult burden than if they were criminal defendants seeking to exclude evidence against them at trial. This fact is borne out by this court's own experience, which has seen a large number of motions to exclude evidence, but comparatively few civil actions against officers in this context. This court has previously stated its views that there was probable cause for obtaining the warrant in this case and that Sims

proceeded in a non-reckless manner in doing so. In light of these findings, it should be obvious that the court does not regard plaintiffs as having overcome Sims' qualified immunity defense, nor those asserted by the other Crenshaw officers. The court therefore concludes that qualified immunity constitutes an additional, cumulative basis for dismissing plaintiffs' unlawful search claims against Sims and the other individual defendants who signed the application for a search warrant in this case.

### Excessive Force

■ The court turns now to plaintiffs' excessive force claim. This claim is analyzed under the Fourth Amendment's reasonableness standard, which requires a showing of (1) an injury (2) which "resulted directly and only from the use of force that was excessive to the need" and (3) that the force used was objectively unreasonable. *Bush v. Strain,* 513 F.3d 492, 500–01 (5th Cir.2008). As with their unlawful search claims, plaintiffs have conceded their federal excessive force claims as to the county and city defendants, reserving those claims against the individual officers. All of these defendants have raised qualified immunity defenses, which, as discussed in depth previously, places a heavy burden upon plaintiffs to demonstrate that the defense is inapplicable.

In response to these qualified immunity motions, the entirety of plaintiffs' arguments and authority on the excessive force issue is as follows:

> At this stage of the proceedings, factual disputes are to be resolved in favor of the Plaintiffs. Both Strickland and Blue testified that guns were pointed at them for an extended period after the scene was secured by the police. Blue testified that guns were pointed at her children during the search. It is undisputed that the children did not resist and were not otherwise disruptive during the search of the apartment at 111

Terry Avenue. Blue and Strickland were cooperative upon entry.

At the outset, actual physical injury is a factor but not a necessary element of an excessive force claim. *Petta v. Rivera,* 143 F.3d 895, 900–903 (5th Cir. 1998). The proper inquiry is whether the use of force was grossly disproportionate to the need. *Petta,* 143 F.3d at 902.

In analyzing whether the pointing of weapons at individuals and in particular children violated the Fourth Amendment, the Tenth Circuit Court of Appeals has stated:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.... Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use. Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

*Holland v. Harrington,* 268 F.3d 1179, 1192–93 (10th Cir.2001). In *Holland,* officers pointing guns at children after they had control of the situation was not justified and violated a constitutional right. *Holland,* 268 F.3d at 1193.

Certainly, most troubling is Deputy Linzy's (Quitman County) pointing of a

gun in Beyonce Strickland's face and then pointing a gun at the children after the scene was secure. But Sims and Willard (Crenshaw) pointed guns at Strickland after he was handcuffed, according to Strickland. Guns were also pointed at Blue by Shelton (Crenshaw) and Linzy (Quitman) at a time when she posed no danger. The excessive force claims should be determined by a jury. *See e.g. Heitschmidt v. The City of Houston*, 161 F.3d 834, 839–40 (5th Cir. 1998). All Defendants dispute that guns were pointed at the children. Blue's testimony directly conflicts with this. At this stage, factual disputes should be resolved in favor of Plaintiffs.

[Plaintiffs' brief at 17–18].

In considering plaintiffs' arguments, the court initially notes that they make no argument that they suffered any sort of physical injury. Moreover, Blue testified in her deposition that neither she, nor Strickland, nor any of the children had sought medical treatment for any injury, physical or emotional, resulting from the search. This is significant, since in *Brown v. Lippard*, the Fifth Circuit wrote that:

> In evaluating excessive force claims, courts may look to the seriousness of the injury to determine "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). This Circuit has found an injury insufficient to support an excessive force claim where there is no physical injury, *see, e.g., Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999), or where it is extremely minor. *See Siglar v. Hightower*, 112 F.3d 191 (5th Cir.1997) (bruise caused by having ear twisted considered de minimis). The attack and injuries

described by Brown cannot be likened to a twisted ear.

*Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir.2006).

As noted above, plaintiffs cite *Petta v. Rivera*, 143 F.3d 895, 900–903 (5th Cir. 1998) for the proposition that "actual physical injury is a factor but not a necessary element of an excessive force claim," but they ignore the fact that the Fifth Circuit still required a showing of some injury in that case, either physical or psychological. *Petta*, 143 F.3d at 902 (requiring that "the Petta children . . . prove that Rivera's actions caused them any injury.") The Fifth Circuit in *Petta* did note that the "significant injury" requirement had been discarded in Fourth Amendment cases, but the requirement of *some injury*, either physical or psychological, still exists.

The Fourth Amendment injury standard was stated by the Fifth Circuit in *Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004), where the Court wrote that:

> Next, we reject Kalina's argument that psychological injuries alone are never sufficient to sustain a Fourth Amendment claim. A plaintiff alleging an excessive force violation must show that she has suffered "at least some injury." *Jackson v. R.E. Culbertson*, 984 F.2d 699, 700 (5th Cir.1993). While certain injuries are so slight that they will never satisfy the injury element, *see, e.g., Glenn [v. City of Tyler]*, 242 F.3d [307] at 314 [ (5th Cir.2001) ] (holding that "handcuffing too tightly, without more, does not amount to excessive force"), psychological injuries may sustain a Fourth Amendment claim. *See Dunn v. Denk*, 79 F.3d 401, 402 (5th Cir.1996) (en banc). The plaintiff's physical injuries in *Dunn* were only bruises, but she suffered substantial psychological injuries. *Id.* We held that she alleged an injury sufficient to demonstrate the violation of

a clearly established constitutional right. *Id.* at 402–03.

In *Flores,* the Fifth Circuit appeared to accept for the purposes of the motion for summary judgment that the plaintiff suffered from "post-traumatic stress disorder, mental anguish, headaches, and nightmares." *Flores,* 381 F.3d at 395. It is not clear to this court what proof the plaintiff in that case used to establish that evidence, however, and it is therefore of somewhat limited utility in this case. Still, the plaintiff in *Flores* clearly alleged an actual diagnosable mental disorder (PTSD), which at least suggests that some objective medical evidence was involved.[3] Moreover, the Fifth Circuit in *Flores* relied upon its decision in *Dunn,* and the panel decision in that case noted that the plaintiff had presented testimony from her psychiatrist that she suffered from PTSD. *Dunn v. Denk,* 54 F.3d 248, 249–50 (5th Cir.1995). This further suggests to this court that some form of medical evidence is generally required to establish a psychological injury in this circuit.

 The two adult plaintiffs do not even make an arguable case for any such psychological injuries in this case, and, additionally, they submit no authority "clearly establishing" that any of defendants' actions were objectively unreasonable as to them. This court's analysis is thus clear with regard to them, and it will reserve its remaining discussion for the claims of the minor children. As noted in the court's statement of facts, plaintiffs do at least arguably make some allegations of psychological injury with regard to their children, as follows:

> Blue testified that during the search, Dewayne Linzy of Quitman County pointed a gun directly at her oldest daughter (Beyonce) and the other children who were in front of the oldest daughter as they were walking out of the house.... The minor girls' grades have been negatively impacted. He could not afford desired counseling for the children. Blue said her oldest daughter, Beyonce, was negatively affected by having a gun in her face.

In the court's view, such evidence is insufficient to establish a psychological injury, since the foregoing authority suggests that the Fifth Circuit would require that any psychological injury be demonstrated by medical testimony, or at the very least some form of reliable, objective proof of an injury.

In the court's view, Blue is not qualified to testify whether her children suffered a psychological injury caused by Deputy Linzy's allegedly pointing a gun at them or whether a decline in the children's grades is attributable to that brief incident (which Linzy denies even occurred). Moreover, as an individual with a financial interest in this lawsuit, she is not an objective observer regarding this issue. The court further notes that plaintiffs have presented no evidence from the minor plaintiffs themselves in this case, either as to what they witnessed during the search or the effect it may have had upon them. They have likewise presented no school records or testimony from teachers (or any other objective observers) as to any decline in the children's performance or signs of psychological injury in them after the search in this case. Thus, plaintiffs' proof in this case is much weaker than it could be, even considering their failure to offer actual medical evidence. Plaintiffs simply ask

---

**3.** Defendants note that a Texas district court has cited *Flores* for the proposition that "[o]nly substantial psychological injuries are sufficient to meet the injury element of a claim for excessive force under the Fourth Amendment." *Parker v. Missouri City, Tex.,* 2014 WL 7004061, *12 (S.D.Tex.2014).

this court to allow a jury to take Blue's word for it all.

It seems clear to this court that, even assuming for the sake of argument that Blue's word alone is sufficient to create fact issues regarding whether Linzy at least briefly pointed a gun in the direction of her children, her account is not nearly detailed and specific enough to support a conclusion that he acted in an objectively unreasonable manner, within the meaning of the Fourth Amendment and the qualified immunity doctrine. This is particularly true in a case involving an execution of a search warrant on a suspected drug dealer's home, where armed entry by police is clearly reasonable. Plaintiffs simply rely upon Blue's account that Linzy "pointed a gun directly at her oldest daughter (Beyonce) and the other children," and this is not the sort of testimony that would establish that an officer was "plainly incompetent" or "knowingly violated the law" so as to overcome a qualified immunity defense. Moreover, "pointing a weapon" at someone strikes this court as being a quite nebulous and subjective concept, and it certainly appears that the holder of the weapon is in a much better position to state whether he actually did so.

Even assuming that Blue's account in this regard could somehow be considered sufficient, the court concludes that plaintiffs have presented insufficient authority to "clearly establish" the parameters of any permissible "pointing of weapons" at occupants of a home during the execution of a search warrant, so as to overcome the qualified immunity defense raised by each individual defendant in this case. As quoted above, plaintiffs cite a single decision from a different circuit, *Holland v. Harrington*, 268 F.3d 1179, 1192–93 (10th Cir.

2001) on this issue, but this is plainly insufficient to clearly establish the law in this regard.[4] Plaintiffs' reliance upon a single decision from another circuit is particularly lacking in light of the fact that the Supreme Court has stated that, to overcome a qualified immunity defense, the defendant must have violated "clearly established statutory or constitutional rights *of which a reasonable person would have known*." *Harlow v. Fitzgerald*, 457 U.S. 800, 801, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981) (emphasis added). While it may be rather fictional to assume that officers would even be aware of Fifth Circuit authority on this issue, plaintiffs have a particularly poor argument on this point in relying on a single decision from another circuit.

■ Some indication of the quantum of authority which might suffice in this regard can be gleaned from recent U.S. Supreme Court precedent, where the Court has suggested that either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals" would be necessary to "clearly establish the federal right respondent alleges" in qualified immunity cases. *Taylor v. Barkes*, —— U.S. ——, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015), *citing City and County of San Francisco v. Sheehan*, —— U.S. ——, 135 S.Ct. 1765, 1778, 191 L.Ed.2d 856 (2015). Clearly, a single decision from one circuit court does not constitute a "robust consensus" among the federal circuits, and plaintiffs have therefore failed to "clearly establish" the parameters of the legal duty which they claim was violated in this case. Even assuming that there are other federal circuits which reached a similar result as the Tenth Cir-

---

4. The court notes that plaintiffs have submitted no authority with regard to any property damage claims they may assert, indeed they essentially ignore the issue in their briefing, even though defendants addressed it in theirs. Thus, plaintiffs are clearly unable to survive a qualified immunity defense with regard to any property damage claims.

cuit in *Holland*, it is clear that, in the qualified immunity context, plaintiffs have the burden of finding and citing that authority, and they have failed to do so.

It appears likely to this court that any "robust consensus" of federal appellate authority which might arise on this issue would need to take account of a number of difficult factors to ensure that the rights of plaintiffs and police officers are appropriately balanced. Courts would likely have to grapple, for example, with the seeming ease with which fact issues in this regard could be manufactured, if it were sufficient for a plaintiff to allege that a gun was pointed at him or a family member and that an emotional injury resulted. Indeed, it is difficult to discern how fact issues in this regard could ever be found lacking in such a legal context, if a plaintiff simply offered his own self-serving testimony in this regard. In the court's view, courts seeking to establish standards in this context would also likely need to consider the issue of whether an officer in question had reason to have drawn his weapon at all. In cases where an officer had such a reason (as when executing a search warrant of a suspected drug dealer's house), then it should seemingly be much more difficult for plaintiffs to establish that his actions in "pointing" his weapon in a particular direction were objectively unreasonable than if he had no good reason to have pulled his weapon at all.

▇▇ That brings this court to a final weakness in plaintiffs' qualified immunity arguments. As discussed previously, the Supreme Court in *Anderson v. Creighton* emphasized that a central part of the qualified immunity analysis involves determining whether a reasonable officer in the position of the defendant *could have believed* that his actions were lawful. *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034. This necessarily requires the plaintiff to demonstrate that the *specific circum-*

*stances* which the officer encountered would have led a reasonable officer to understand that his actions were unlawful, in light of clearly established authority of which a reasonable officer would have known. In their arguments quoted above, plaintiffs do not offer either sufficient factual context or legal arguments to allow this court to make a determination in this regard, with regard to Linzy or any of the other defendants. Indeed, plaintiffs' qualified immunity arguments as a whole are quite brief and conclusory and do not reflect the facts that 1) they have the burden of proving that qualified immunity is inapplicable and 2) they are seeking to impose the expense and stress of trial upon officers whom the law does not lightly consider to be either "plainly incompetent" or willful constitutional violators. In light of the foregoing, the court finds plaintiffs' proof and arguments insufficient to overcome a qualified immunity defense, and defendants' motion to dismiss the excessive force claims asserted against them will therefore be granted.

At this juncture, the sole remaining claims before the court are plaintiffs' state law claims, including claims asserted under the Mississippi Tort Claims Act (MTCA). In a case such as this one, where all federal claims are dismissed prior to trial, 28 U.S.C. § 1367(c)(3) gives this court discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. Indeed, the Fifth Circuit has noted that the "general rule favor(s) dismissal of state claims when the federal claims to which they are pendent are dismissed," *see Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir.1999), and the court concludes that it should follow the general rule in this case. In so concluding, the court places significant weight upon the fact that Mississippi state courts have a strong interest in determining whether and under what circumstances the municipalities and

officers of this state should be held liable under state law for allegations such as those in this case, particularly since these issues implicate the public coffers. Mississippi courts also have much greater experience in applying that state law, and only the Mississippi Supreme Court has the authority to make new law in this context, thus greatly increasing its flexibility to deal with novel issues of law, with no need for *Erie* guesses or the time-consuming certification process. The court will therefore decline to exercise supplemental jurisdiction over plaintiffs' state law claims and dismiss those claims without prejudice.[5]

It is therefore ordered that defendants' motions for summary judgment are granted in part, as to plaintiffs' federal claims, and this court declines to exercise supplemental jurisdiction over the remaining state law claims. Plaintiffs' federal claims will therefore be dismissed with prejudice, and their state law claims will be dismissed without prejudice.

A separate judgment will be entered this date, pursuant to Fed.R.Civ.P. 58.

### JUDGMENT

For the reasons given in the court's order entered this date, it is hereby ordered and adjudged that this case is dismissed.

---

**5.** The court notes that § 1367(d) provides for the tolling of any relevant statutes of limitations applicable to state law claims during the pendency of this action and for thirty days after their dismissal.